The opinion of the Court was delivered by
Evans, J.
Since the cases of Duke vs. Dyches, and Jaggers vs. Estes, (2 Strob. Eq. 343,) it is no longer an open question, whether a man may not, by deed duly delivered as such, give to another a negro, reserving to himself a life estate therein, provided that, by the operation of the deed, a present title passes to the donee, but the possession only is postponed to the death of the donor. This I take to be the result of the decisions in the cases referred to. There is no doubt that the written instru *195 ment in this case, conveyed to the defendant’s wife a title to the negro after the death of Benjamin Johnson, but if no title passed by it until after his death, then it would be a will, and unless proved and allowed as such, it cannot avail the defendant. To make it available to protect his conversion of the negro, the instrument must be supported as a deed, whereby the title passed from Johnson at its delivery, but subject to the right of possession and use during his life. The paper is in the following words, viz: — “ Know all men by these presents, that I, Benjamin Johnson, of the State and district aforesaid, for and in consideration of the love and affection I bear my sister, Anne Burnet, the wife of John Burnet, of the State and district aforesaid, and the further consideration of the sum of one dollar to me paid, the receipt is hereby acknowledged, have given, granted, bargained and sold, unto my sister, Anne Burnet, a negro boy, aged about ten years, named Ail; to her and her heirs, which said negro I bind myself, my executors, administrators, &c. forever to defend in law and equity against all claim. It is clearly and unequivocally understood that the aforesaid deed of gift is to be of no effect whatever, until I, the aforesaid Benjamin Johnson, depart this life.”
The question which first presents itself is, what did the donor mean? for that is to govern, if we can ascertain it. Did he intend to create a mere revocable' estate, a mere declaration of a present intention as to the person to whom Ail should belong after his death ? If he did, it is a will, which is of no avail until it has been proved and allowed in the proper Court. Or, did he intend to vest the present title irrevocably in his sister, but not intended to take effect in possession until after his death ? The form in which an act is done is not always material, and I will not undertake to say that this paper might not have been allowed as a will, although its form is that of a deed. I consider the form used in this case as important only so far as it is evidence of what was intended. What, then, are the evidences afforded by the paper itself, that the donor intended to convey a present estate in the negro. These are (1) The form *196 is that which is usual in deeds; and the words, given, granted, bargained and sold, are those most appropriate to the office of a deed, and, except “ give,” are inappropriate to a will. (2) A money consideration is expressed in the deed, and was actually paid. I would not be understood as meaning that a nominal consideration of one dollar, would necessarily change the nature of the instrument, but it affords a very strong evidence that the conveyance was intended to be irrevocable. (3) It contains a covenant of warranty, such as is inconsistent with the idea that a will was intended. (4) The donor himself calls it a deed of gift. In general, men are supposed to understand the meaning of the words they use, and it would be rather unusual if we were to conclude that what a man calls a deed of gift he intended as a will. (6) It was delivered to the donee, and the negro actually delivered and remained in her possession for more than a year. These facts, if they stood alone, or almost any of them, would be sufficient to shew an intention to convey a full and clear title, if it were not for the words used in the concluding clause, viz : — “ It is clearly and unequivocally understood that the aforesaid deed of gift is to be of no effect whatever, until I, the aforesaid Benjamin Johnson, depart this life.” These words, some of my brethren think, shew an intention that no estate should vest in Mrs. Burnet, and convert the whole of what precedes them into a declaration that she was to have no estate whatever in the negro, until after the death of Benjamin Johnson ; or, in other words, that the paper is a testamentary disposition. My understanding of the rules of interpretation is, that every part is to have effect, if the same can be done consistently with the rules of law. Now what rule of law interferes so as to prevent us from giving to this paper, as a deed, the same construction as was given in Jaggers vs. Estes and Duke vs. Dyches, to vest a present title in Anne Burnet, subject to the right of Johnson to the use and enjoyment during his life ?
The words of restriction will thus have all the ffect which I suppose was intended, viz: — to reserve to himself the use and control during his life, and, until that event, was to have no *197 effect so as to give any right of possession. To give it the effect of changing entirely the legal import of all the words which he had before used, would be a very strained and unnatural interpretation, such as is not required to give effect to any conceivable intention which he could have had, unless we suppose he was entirely ignorant of the meaning of words ; that when he said I have given, grantedi bargained and sold, he meant only I give and bequeath; 'when he said I warrant, he meant nothing ; when he said this ded of gift, he meant this will; or that he meant to vest no present title when he delivered the deed and the negro along with it; which were essential to a deed, but wholly unnecessary to a will. It may be as well, as there is a division of opinion in the Court, to notice some of the cases which have been decided. I will not undertake to say what would have been the effect of this deed forty years ago, when the cases of Cooper vs. Cooper, (2 Brev. 355) and Vernon vs. Inabnit, (Id. 411) were decided. Then the notion was, that an estate in a chattel was indivisible; nor how this deed would have been construed when Ingram vs. Porter was decided, where it was held that a reservation of a life estate in a deed was void because the habendum was inconsistent with the premises. In Ragsdale vs. Booker, reported in a note to Jaggers vs. Estes, (2 Strob. Eq. 348,) an instrument containing the words, “in consideration of natural affection, I give to omy above named children at my death, Spc. I only reserve my life in said negroes,” was held to be a will, because it did not profess to be delivered. The Court say, it wants some of the requisites of a deed. It was to remain the property of the donor, and was subject to his debts. It possessed all the essential ingredients of a will. In Duke vs. Dyches, the paper had the form of a deed, and purported to have been delivered. It was on natural affection alone. The operative words are, “ have given and granted and by these presents do give and grant, &c. to Esther Benson, her heirs, &c. to remain her right and property after the death of the said Moses Duke” (the grantor) “ or at any time previous thereto if the said Moses Duke should think fit to do so.” The only question discussed, in the opinion of the Court, was whether *198 personal estate could be limited over, to take effect after a life estate, by deed. It was in form a deed and purported to have been delivered. It was not even argued that it was a will, but the question submitted was on its effect as a deed. The words in Jaggers vs. Estes are very much the same. In that case, the questions made were pretty much the same as in Duke vs. Dyches. The only doubt was whether it had been consummated by delivery, which was afterwards established by the verdict of a jury. I have seen no case where the instrument was in form a deed, accompanied by delivery, which has been construed into a will, although a life estate was reserved to the donor. The words, have given, granted, bargained and sold, purport to convey a present interest. They are the operative words of a bill of sale, and the donor so calls the instrument in which they are contained. It seems to me, therefore, that by construing the instrument as a deed, and giving to it the same effect as in Jaggers vs. Estes, we give effect to the donor’s intention, and efficacy to every part of the deed. The late case in the Court of Equity, of Wheeler vs. Durant, (a) is not, according to my understanding, at variance with this decision. The question was, whether it was a will or a deed. There was nothing in its form or words, or the nature of the estate conveyed, which required any other construction than that it was a will, or testamentary paper, which was the interpretation put on it by the donor herself. We think, therefore, that the paper signed by Benjamin Johnson was a deed, and, as such, conveyed the negro Ail, to the defendant’s wife, and that he was guilty of no conversion, unless he had lost his title by the statute of limitations.
Statutes of limitations are no where considered as a part of the lex loci contractus. They are a part of the law of the forum where the action is tried. If, therefore, a citizen of Alabama sue in this State, his right to maintain his action must depend on our law, and he will be barred in five years, although, by the laws of his own, he might be allowed a longer or shorter period. Every government has a right to fix its own period of *199 limitation, and if a foreigner bring an action in any State, he has no right to complain if the same rule is applied to him as to citizens. I had occasion to discuss, in the case of Pegram vs. Williams, (4 Rich. 219) what questions belong to the lex loci and what to the lex fori, and the cases of Levy vs. Boas, (2 Bail. 217,) and McElmoyle vs. Cohen, (13 Peters, 312,) are there referred to as establishing the proposition that the statutes of limitations are a part of the lex fori. Indeed, this proposition is universally admitted to be true. Judge Story says, the statute of limitations and prescriptions, there is no doubt, are questions affecting remedies, and not questions upon merits. Story de Confl. § 576, 577, 582. If, therefore, when Alexander brought the negro into this State, Burnet had sued him in trover, and Alexander had set up the statute of limitations as his de-fence, the enquiry would have been, is he barred by our Act ? This makes it necessary to enquire what our law is, relative to the limitation of actions of trover. By the Act of limitations, passed in 1712, if both parties are resident in the State, the action must be brought within four years from the time it accrued, but if the plaintiff was resident out of the State, he was allowed five years. This provided for the case of an absent plaintiff, but not for an absent defendant; but the statute of 4 Anne, c. 16, which was made of force at the same time the Act of 1712 was passed, provides that in case persons against whom any such actions shall accrue, shall be beyond seas, at the time such cause of action accrued, the persons entitled to such action may bring the same at any time after their return from beyond seas, so that the action be brought within the time limited. Now as Alexander was beyond the limits of this State (which means the same as beyond seas) when Burnet’s right of action against him accrued, the statute did not commence to run until his return to this State. This is clearly settled by the case of Smith vs. Mitchell, (Rice, 316). There is no avoiding this conclusion, unless one of the following propositions can be maintained, all of which the circuit Judge seems to have entertained from his report of the case: (1) That a right of action *200 having accrued in this State to Burnet by the conversion of John Johnson and James Caldwell, under whom Alexander claimed, Burnet would be barred unless he brought his action within four years from the first conversion: (2) That the statute commenced to run when Alexander passed through the State in 1837, 1841, 1844 and 1845, although he was not in Abbeville where Burnet resided: (3) That Alexander’s possession in Alabama was a bar to Burnet’s title, who was a citizen of South Carolina, and not of Alabama. These questions I will discuss in their order.
1st. I suppose that as the conversion of John Johnson and Caldwell was in the State of South Carolin, and Burnet had a cause of action here, it may be that he would have been barred, as to them, on the doctrine that when once the statute begins to run, it is not arrested by any thing subsequent. But I do not see how this can help Alexander. By our law, every new conversion is a new cause of action. Burnet might hdve sued any one of them — and in such action would not be barred unless some one of them had been in possession long enough to give title. By our law, if the action was brought in this State, Alexander could not plead in bar that Burnet might have sued Johnson or Caldwell. It would not avail him that Burnet might but did not sue either of them. As Caldwell had no title to convey to him, he must rest on his own possession, which was in Alabama, and if this gives him no title here it will avail him nothing. You cannot connect possessions so as to give title under the statute. This was decided in the case of King vs. Smith, (Rice, 10), as to land, and in the case of Beadle vs. Hunter & Garrett, (3 Strob. 331), in relation to negroes. In this latter case it was held, that the possession of one who held adversely to the owner, could not be connected with that of the person to whom he afterwards sold, so as to complete the statutory bar. If Dollar’s conversion and possession could not avail his alienee, how can the possession and conversion of Johnson or Caldwell enure to the benefit of Alexander, their alienee ? It cannot, on any legal principles, be said that Burnet might have sued *201 either of them, and, therefore, his action against Alexander is barred.
2d. It has been argued that the statute of Anne has no application to the case, because Alexander being a citizen of another State, cannot be said to have returned to the State; and, therefore, the statute must relate only to the case of citizens who are absent for a time and then return. This may be the literal import of the words, but where the words of a statute have received a uniform construction, it is always safe to adhere to it. In 6 Bac. Abr. 392, (Bouvier’s edition) it is said “ the exceptions in the statutes of James and Anne as to persons beyond seas are not confined to Englishmen who may occasionally go beyond seas, but is general, and extends to foreigners who are constantly resident abroad.” (3 Wil. 145.) This is clearly the English law, and the same construction, I believe, has been uniformly put on the same or similar words in most or all the States. The only exception which has been brought to our notice in the argument is the case of Cumming vs. Berry, (1 Rich. Eq. 114). I have looked carefully at that case, and my great respect for the venerable Judge who delivered the opinion in that case would incline me to adopt it, although it was without any authority to sustain it, if it had been a point in the case.. The controversy was about a fund in Charleston which was claimed by a creditor in Georgia on the one side, and certain persons resident in South Carolina on the other. Neither of them came within the words of the statute, and the observation by the Judge was incidentally made without argument or refers ence to the authorities, and, I presume, the assent of the other Judges was to the judgment of the Court, which did not depend on the correctness of the assertion.
Assuming, then, that Burnet might sue Alexander at any time within the period of limitation after his return to this State, the next question is, whether Alexander’s passing through this State in the manner and at the times stated in the report, was such a return as was contemplated by the statute. If it was, then the action is barred, because more than four years have elapsed be *202 fore the bringing of this action. Some of the authorities on this point are as follows; 3 Mass. R. 271, White vs. Bailey: "A debtor’s return to this government from which the statute begins to run, must be such return as will enable the creditor, using due diligence, to arrest his body as security.” This is reaffirmed in 16 Pick. 359. Where a debt is contracted abroad, by a person resident out of the State, and the debtor afterwards comes into the State publicly, and so that the creditor, using reasonable and due means, might arrest, it is a return to the State within the meaning of the Act. 10 Johns. R. 464. In this case the Court say in addition, that the word return, applies as well to persons coming from abroad where they resided, as to citizens going abroad for temporary purposes. In a case in 8 Ala. R. 328, Ormond, J. says, — “the return from which the statute commences to run must be open, notorious and nor clandestine.” The whole current of authorities is in the same way. The only case which seems to the contrary, is the case of Faw vs. Roberdeau, (3 Cranch, 173. It seems that the law of Virginia is like the English statutes, and the saving of the right of actions applies as well to an absent plaintiff as an absent defendant. In this case, the plaintiff resided in Maryland, but he had been in Virginia for a temporary purpose more than the statutory period before he brought his action, and it was held that he was barred. By our law, and that of many of the States, there is no such saving in favor of a plaintiff resident abroad. There are many reasons for making such a distinction. There is no impediment in the way of the plaintiff’s suing. He knows where his debtor is; the law is open to him, and if he comes into the State and does not avail himself of it, it is his own fault. The same reason allies if the defendant comes openly into the State, although for a temporary purpose, if, with due diligence, he might have sued. The reason why he is not barred is, because he could not have brought his action. Whether Burnet might have sued Alexander when he thus passed through the state, is a question of fact which must be decided by a jury.
3d. It seems, from the report, that the circuit Court charged *203 the jury that the plaintiff's possession in South Carolina or Alabama, or any where else, gave him a title, unless the defendant could shew that the statute did not operale on him. If by the statute is meant the statute of this State, I think that was abundantly shewn by the saving of his right by the statute of Anne, as expounded in Smith vs. Mitchell. If the Alabama statute be meant, then, as the defendant claimed under it, it was on him to shew, not only what the statute was, but that he had a good title to the negro under it. No evidence of what the Alabama statute was, was given on the trial. In this Court we have been referred to Clay's digest, but I have not examined it, as in the view taken by a majority of the Court, it is immaterial what are its provisions. The proposition set out in the charge is, that possession in Alabama for six years, which, it is said, is the time of limitation there, will give the possessor title, not only in Alabama but in the State of South Carolina and every where else.— If, as I suppose, the statutes of limitations be merely a part of the law of the forum, — if they be, as the authorities say, of merely territorial operation, affecting remedies and not merits, as Judge Story says, it is difficult for my mind to conceive how they can operate on a citizen of another government, so as not only to take away his remedy in Alabama, but also his title to his property in South Carolina. If any such proposition has ever been sustained, I have not seen the case. The case of Brent vs. Chapman, (5 Cranch, 358,) is quoted as authority on that point. The proposition declared in that case is, that five years possession of a slave in Virginia gives a good title upon which trespass may be maintained. But the facts of the case shew that all the parties were resident in Virginia, and that the case only affirms what I do not doubt, that between citizens or residents of the same State, a possession for the whole period of limitation will not only operate as a bar to the remedy, but as an extinguishment or transfer of the title. We speak familiarly of a title by the statute of limitations, and are accustomed, to say that a title under the statute is as good a title as a deed,- arid one that will sustain an action as well as any other title. If Cald *204 well had had possession of the negro four years in this State, and had then carried him to Alabama and sold him to Alexander, his title would have been as good as if Burnet had sold and conveyed him. The reason is obvious; as between citizens of the same State the statute operates as a divesture and transfer of the title. But as between citizens of different States, there is no authority or reason for saying that any thing more than the remedy is. taken away. In Story de Confl. § 582, the following proposition is stated; “ suppose the statute of limitations of a particular country does not only extinguish the remedy but the claim or title itself, and declare it a nullity after the lapse of the prescribed time, and the persons aie resident within the jurisdiction all that period, so that it has actually operated on the case, may not such statute be set up in any other country to which the parties may remove, by way of extinguishment or transfer of the claim or title.” The authorities quoted are, Shelby vs. Guy, (11 Wheat. 361); Brent vs. Chapman, (5 Cranch, 358,) and another case from Henning & Munford’s reports. The case of Shelby vs. Guy, was an action to recover slaves in the State of Tennessee. Shelby claimed under one T. T. G. who had possession long enough to give him a title by the laws of Virginia, where he, and those under whom Guy claimed, resided. After the title was thus perfected under the laws of Virginia, T. T. G. sold the negro to Shelby. It was held that Shelby’s title was good, because it was perfected in Virginia before the slaves were carried to Tennessee. It will be observed that Story does not state this as clear and settled law, but states it hypothetically and on the supposition that the statute to have this effect, should not only take away the remedy, but extinguish the claim or title, and declare it void after the lapse of the prescribed time. The cases quoted are all Virginia cases, and I have had no means of knowing whether the Virginia statute is of the description above stated. Our statute professes only to take away the remedy, but we have construed it to transfer the title after the expiration of the prescribed period, where both parties reside in the State. We have no case or *205 authority to say the same where the possession is altogether in another State. The only case in which the question was as to the effect of possession in another State upon rights in this State, is the case of Richards vs. Towles, (3 Hill, 346). The negro, in that case, was subject to the lien of an execution in this State; he was carried to Georgia, where he was kept seven or eight years; he came back to this State and was seized and sold by the defendant, under the execution, and it was decided that the possession in Georgia did not bar the lien in this State. That case is not decisive of this, as it might have been decided on the ground that the lien .could not reach the slave in Georgia, but it shews at least that bare possession in another State does not give title as against one having a hen in this State. By our laws, a lien is so far considered a title that it is barred by the statute of limitation^ as any other title is barred. When the title is perfected by the laws of the State where both reside, the case is then to be decided by the lex loci, and no longer belongs to the lex fori. ' What is called the comity of nations requires of us in such cases, to give it the same effect as is given to it by the laws of the Slate to which both parties owe allegiance, but it does not require any thing more. A majority of this Court are of opinion that, upon the evidence at the trial, the plaintiff w.as not entitled to recover, and the motion for a new trial is granted.
Wardlaw, Frost and WhitNer, JJ. concurred.

 3 Rich. Eq. 452.